Okay, and the final matter. May it please the court, Hashim Mupan for the federal government. I'd like to reserve... Can you pronounce it for me one more time slowly, you know? Do the best I can not to mispronounce it. Your name again is? Hashim Mupan. Mupan? Mupan. Okay. For the federal government. I'd like to reserve three minutes for rebuttal. Okay. The briefs in these cases have addressed multiple issues. I'd like to focus on three of them this morning. First, that the ACA authorized the religious and moral exemptions. Second, that RFRA authorized the religious exemption. And third, that the district court abused its discretion in granting nationwide injunctive relief. Starting with the first issue. The ACA's preventative services mandate provides that preventative services have to be covered only for services as provided for in guidelines supported by HRSA. Those are guidelines that were going to be promulgated after this statute was enacted, correct? Correct, Your Honor. And that language, as provided in, clearly authorizes, and at a minimum does not unambiguously foreclose, HRSA's discretion to provide the manner in which such services are provided. Your position is that language supports the view that an administrative agency can decide who has to comply with the law. I wouldn't phrase it that way, Your Honor. It's not a question of who has to comply with the law. It's a question of what services have to be provided in the first place. But the regulations that are under review and under challenge here all talk about who. Who needs to provide or who's exempt from providing. And your real authority for that proposition is the as provided for language? That's right. But the distinction is it's not who has to comply with the law. It's what the law actually provides. The language of the statute only requires plans to provide services as provided for in guidelines supported by HRSA. So if the guidelines that HRSA provides do not require contraceptive services for religious objectors, then they are complying with the law. It's not that the agency is exempting them from what the law requires. The agency is providing what the law requires. Congress knows how to speak about who to grant exemptions to, right? It does, Your Honor. It works out here by the grandfathering provisions. It did so by rejecting the Conscience Amendment, correct? That's true, Your Honor. So if Congress has demonstrated it is going to exercise its authority about who needs to provide the particular services, doesn't that speak to the fact it's not the agency's job? No, Your Honor, because those exemptions are exemptions from what Congress has already provided. So, for example, the grandfathering exemption says the things that the statute itself requires, not what the agency provides but what the statute requires, Congress has created an exemption from that. That is very different from here where contraceptive services never had to be provided in the first place. That was a discretionary judgment call that Congress delegated to the agency. And as part of that delegation, nothing in the statutory language restricts the delegation to putting the agency to an all-or-nothing choice, the choice of either providing contraceptive services and requiring all religious entities, even, for example, churches, to provide those services or not providing it at all. Nothing in the language, and this is important. This is a Chevron case. They have to show that the language unambiguously forecloses creating an exemption, and they simply can't do that. From the very beginning of the contraceptive services mandate, there have always been these sort of religious exemptions. Well, let's assume that the statute allows some sort of regulatory activity to occur in the form you're discussing, which is who has to provide or who can exempt themselves from providing. There's a big dispute about whether the APA was complied with here, correct? There's a dispute about that. You may think it was, but your adversaries say that APA was not complied with, and the district court said there was an APA violation, correct? So if you're referring to the procedural question, Your Honor? The procedural and the substantive one. We'll talk procedure first. All right. So there is a procedural challenge that was relied on by the district court below with respect to the IFR, and then the district court further said that the IFR somehow tainted the final rule, even though the final rule unquestionably went through notice and comment. You said it tainted the final rule. The final rule was not sufficient. The fact the final rule was promulgated wasn't sufficient to cure the problems the district court found in the IFR. Well, I think the district court said something like that. I just don't quite understand what the district court meant, because the question here isn't about curing the taint of the IFR. If the final rule is valid, that's all that matters. They are only seeking injunctive relief. The only question in this case is going forward as a prospective matter, are these exemptions valid? So whether the IFR was legal or illegal is utterly irrelevant at this point in this case. How can you say that that was given our precedent where we have case law, more than one case where in the Third Circuit our court has held a tainted IFR can infect a final regulation? With all respect, Your Honor, I don't think that's true. There are three cases in this court. Two of them, Sharon and Reynolds, do not involve a second final rule. What they talk about is something very different, which is the agency first went through and without notice and comment promulgated something. Then there were further comments, and that's it. The agency never promulgated a second rule. So those cases are just completely distinguishable. We're not arguing here that if we hadn't promulgated the second rule, the mere fact that there was a subsequent comment period would somehow make the IFR okay. Do you concede that the IFRs in this case are procedurally invalid because there was no notice and comment? No, Your Honor. We have argued both in our briefs and in other cases that we think that there are multiple reasons why notice and comment wasn't required for the IFR. What was that? What reason do you have for that? I have the same concern. No notice, no fair comment, no opportunity for the public or any other agency to weigh in? We have two arguments, Your Honor. First, we have the argument that the statute itself authorizes the agency to promulgate interim final rules. But that statute does not do what the APA requires, which is expressly authorize it to be done without regard to APA procedure. So there's no magic words requirement under the APA, Your Honor? No words at all, though. Forget magic. There's no words at all. Well, I think there is, Your Honor, in the sense that the language of the statute says that they can pass interim final rules where they deem appropriate. That is certainly not the standard for promulgating interim final rules under the APA. Are you suggesting that the statute could otherwise have said they can promulgate final rules where they deem it inappropriate? I'm not sure where that gets you. What it gets me is it's not the standard of good cause under the APA, just as in the cases like the Asiana case that we cited where you have a statute that authorizes it. And where appropriate is the statutory deprivation that excuses you from notice and comment? So it's the fact that it says interim rules, interim final rules, which is a term of art that means you don't have to go through notice and comment. What's the authority for that? Do you have some authority that says interim final rules can be issued without notice and comment? Do you have a statute, a case? That's the definition of an interim final rule. Where is the definition? You know, off the top of my head, I don't think it's disputed between the parties here. Everyone agrees that the interim final rule. You're saying everyone is saying interim final rules can be issued without notice and comment? Without notice and comment. The only fight is about whether the standard for invoking the interim final rule authority is met. There are arguments that even under the ACA statute, the as appropriate language requires satisfying the APA standard, namely that you have to have a good cause. And if you don't have a good cause. I'm with you on that. So I want to make sure I understand your argument. Are you saying they can be issued without notice and comment, but only if there's good cause? No. So we have two arguments. One argument is under the specific statutory language in the ACA, all that is required is for the agency to deem it appropriate. That's the language in the actual statute. Okay. Our second argument is if you don't think that that's enough to displace the APA, then we satisfy the APA's good cause standard here. But again, I think the more important thing for present purposes is none of this matters for the relief in this case. If you dispense with notice and fair comment, do you sense that there's an obligation to do it later? Is that your view? I mean, do you dispense with them entirely? So for an interim final rule, you're not required to go through notice and comment. Gotcha. I understand your position. Often agencies will then subsequently do comment because there are values to comment. But again – Go ahead. But I think we have said that that's not a good thing, NRDS versus EPA. We said you can't do it that way. So, again, what I want to emphasize is this is not a case where we just did an interim final rule, had some additional comments and said that's good enough. We actually had a second full rulemaking. We had a full notice and comment theory. But all you're doing is validating what you've already decided. Right. Even the district court here concluded that we adequately responded to the comments that were received. There's just no basis to say that this was prejudged. The agency fully considered the comments that were received. They made some changes in response. To be clear, they weren't very substantial changes. They were mostly – They weren't substantive, were they? There were some substantive. They were small. There were some technical ones. But there was just no basis to say – But really, what were the substantive changes? I think probably the biggest substantive one turned on when you have a self-insured church plan, whether it's at the plan level or at the employer level. I don't mean to suggest that this was a major change. But I think what's important to recognize is we fully addressed their comments. And the idea that we would have to make some substantive change – Well, what if their comments are all bad? It doesn't make sense that we could somehow be permanently disabled from promulgating this rule just because we previously went through an IFR. Under their theory, I just don't understand how the government is ever able, going forward, to have this rule. Of course you could. But you have to have fair comment. We did. They had a notice and comment. But you did it after you already had established the rule. But so we're in that world now. So, Your Honor, what I don't understand is, as I stand here today, I don't understand their position how the government could ever promulgate this rule. Because it is always going to be the case – This rule. Huh? This particular rule. This particular rule. Their theory is because we went through an IFR without comments, that somehow paints our subsequent final rule. That means, I think, that the government can never do that. I'm not sure that I would agree with that. But the point that is in this case, there seems to be a deficiency in following the appropriate procedure. I guess my point, Your Honor, is when you say this case, what can the government do going forward? It can't be we can go through notice and comment. We already did that. What else can we do? Well, comments, you did that after you had already established – Right, and that's always going to be the case. In this very case. You mean that can always be the case? Did I hear you right? I'm saying in the facts of this actual case where the interim final rule has happened, we can't unring that bell. It is the case that we went through an interim final rule and didn't provide comments. So what, at this point in time, going forward, can we possibly do? Here's what I'm thinking. Now, it's a bad precedent. If we say, yes, you're right, then every other agency subsequently can do the same thing. Do the rule, then do the comment, and then they say, well, you can't unring the bell. Again, the way you deal with that is to make sure that we do valid notice and comment on the second step, which we did. We went through the notice and comment period. We considered their comments. The district court did not disagree that we adequately responded to their comments. They made that argument. They made the argument that we didn't pay attention to their comments, and the district court rejected that argument. And at that point, it has surely got to be enough because otherwise we would be permanently disabled, and that's what other circuits have recognized, including the First Circuit cases we cited in our briefs. You're basically saying that although you didn't follow the recommended procedure, it should be excused. That's not what I'm saying. Because you cured it later. It's not even a question about curing. The final rule did comply with the procedures. We promulgated a final rule. We gave people notice. We gave them comments, and then we promulgated a rule. That is picture-perfect APA. The only question is whether somehow that is tainted by the fact that we did something else before. This isn't a question about whether we're trying to use what we did subsequently to cure what we did before. It doesn't matter at this point in this case whether the original rule was valid or invalid because they're only seeking prospective injunctive relief. The only question that matters at this point is whether the rule is valid going forward, and for those purposes, the final rule complied with the APA. They had notice. They had comments. They had an opportunity to comment. We responded. The district court concluded we adequately responded to their comments. That should be the end of the matter as far as the procedures go. Just to go back to your third case, because you said there were multiple cases. There were three. Two of them are distinguishable for the reason I said, that there was no final rule. The last is the NRDC case. The reason that case is critically different is in that case the interim final rule, the invalidity with the interim final rule was that it changed in an effective date. So if that interim final rule was invalid, that meant that some prior rule went into effect right then and there, and then the question is, well, how do you then deal with the subsequent rules? That's totally different from this case because, again, all that matters in this case is going forward, what is the rule? And so there's a critical substantive difference because that case, the validity of the interim final rule mattered separate and apart from the subsequent rules that followed. Some people would say that the interim final rules were out there and it put out a view that somehow shows the agency was not open-minded to all the comments it received that generated the final rules. So there is at least some case law within this circuit which is difficult for you to overcome. Again, I don't think that's right. I understand your distinction. I do understand it. I do understand it. As it relates to RFRA. Yes. RFRA, let's assume that we were to conclude that the ACA does not provide authority to rule-making in this subject for the purpose of this question. The only statutory authority you have is RFRA. Okay? If you go back and look at the statute and you're looking at the text, pointing to the text in the ACA, you look at the statute in RFRA, RFRA creates basically a cause of action to bring to a court for a court to evaluate whether a particular entity or individual's belief system has been substantially burdened by a federal government action. Correct? It does that. It creates that. Pointing to where within the RFRA statutory scheme gives regulatory authority. Sure. It's the very first part of RFRA. You're right that RFRA provides a cause of action, but what RFRA does first and foremost is it's a prohibition on the government. It says the government shall not substantially burden religious exercise. I understand. It defines the government as an agency and it defines the scope of RFRA as the implementation of federal law. By definition, if we promulgate a regulation that substantially burdens religious exercise, we are violating RFRA. Okay. So their theory has to be that under RFRA, what we are supposed to do is just violate the statute and wait to be sued. And, by the way, in the Third Circuit, Your Honor, and we don't necessarily agree with this precedent, but you should know the Third Circuit has held that there are money damages available against the federal government for violations of RFRA. So on their theory, we have to promulgate a regulation that we know to violate RFRA, wait to be sued, and then get hit with money damages on top of it. Here's the situation you have. Before the 2017 regulations, the IFRs, the finals, were in place, there was a regulatory scheme as an accommodation scenario that allowed to address that substantial burden. So there was already a regulatory scheme that took care of this. Why did you need to go to this extra step? Well, Salsa, two things about that.  Because that accommodation itself can only be authorized either under the ACA or RFRA. From where else would it have come? And it is a departure from the ACA. It's important to emphasize that point. The ACA requires that the plan and the insurer provide the services. The mandate, right? Yes, the mandate. The mandate requires that the plan and the insurer provide the services. The whole point of the accommodation, the whole point of it was to say that the plan doesn't provide it. So that is a departure from the ACA. So if we don't have authority to depart from the ACA. But the accommodation facilitated the provision and compliance with the statute. It just got the objecting employer out of the scenario. It doesn't comply with the statute. That's my point. Oh, if it doesn't comply, then how can your regulation comply? That's my point as well, Your Honor. Right, but then your regulation can't comply with the statute. No, what I'm trying to say, Your Honor, is that if you look at the plain text of the mandate, it says the plan and the insurer. The accommodation doesn't involve the plan. So they've departed from the language of the mandate. The accommodation doesn't apply to the plan? It applies to the issuer? Yes, the whole point is to take the employer out. The plan doesn't have to provide the coverage. Okay, we're saying the same thing. Go ahead. So either we have authority to do that under the ACA, right? Not with saying the plain text of the statute, which said the plan and the issuer. We have the authority under the ACA to take it away. Or we have authority to do that under RFRA. It has to be one or the other. You're not taking it away there. You're just taking the employer's responsibility to facilitate it. Right, so we are taking out their statutory obligation under the ACA. But your regulation here, making that accommodation experience voluntary, makes nobody responsible. Again, Your Honor, the point of view, I'll say a couple things about that. The first, just to finish the point on this, is on the theory that we don't have authority to create exemptions under either the ACA or RFRA, that would mean the accommodation itself was illegal. Second is the accommodation itself actually left people not covered, right? Because the accommodation, the way the accommodation works is once the employer is out, either the insurer or the third-party administrator has to come in and provide the services for so-called self-insured church plans and to clarify what that means, you have churches who are categorically exempt under the religious exemption. There's also a church plan which can involve entities that aren't themselves the churches but they're controlled by organizations affiliated with churches. Would you consider that forms that category of auxiliaries? No, it's different from that. You're putting it in a different category. It's separate. Think, for example, like a Catholic hospital. It might not even be an auxiliary. It's not sufficiently intertwined as a matter of corporate structure. I understand. That sort of entity, a church plan, it's exempt from ERISA. Exempt from ERISA. Right, and what that means is that under the accommodation itself, the women who work for one of those entities will not receive contraceptive services even under the accommodation. Because they're getting the same benefit as the church exemption generally? Well, so there are two, right? There's the church exemption. Then there's the accommodation. Now, they've tried to say that the accommodation, all the women are going to get the coverage. And what I'm pointing out is that's simply not true. Because people who work for churches and women who work for churches are of this other category. Right, the church plan. Right. And why that's very important is – That's materially different than a publicly traded corporation. Wouldn't you agree? Okay, I don't think it's materially different. In fact, if anything, it sort of cuts the other way. Isn't it materially different because like the Supreme Court precedent that has tremendous respect for religious organizations and protects their internal decision-making? Hizat-e Tabara, et cetera. So I'll say two things about that. First, the church exemption applies to churches that don't even have a religious objection to contraception. Every mosque and every synagogue in this country can invoke the church exemption. Ten. Ten. Okay. Even though they don't have a religious objection to contraception. So the idea that that makes sense but you can't provide a religious objection to someone who actually has a religious objection to contraception, I don't think it makes sense to point out church autonomy. The other point about church autonomy is the church exemption only applies to contraceptive services. All the other preventative services that are covered by the ACA, churches are subject to. So you cannot say that that exemption is based on some sort of belief in church autonomy. It is completely unhearable. So you're saying that if there was a religious organization that objected to transfusion, organ transplants, et cetera, those organizations, those religious entities would have to comply with the ACA. I'm saying that the church exemption does not exempt them. They might well have a RIPRA claim and then we would adjudicate that or the agency would consider creating an exemption for them. But the existing exemption doesn't cover them. And the reason why this matters is the Supreme Court has recognized repeatedly in cases like El Centro and Holt versus Hobbs that when the government provides exemptions for some people but not for others, that's going to undermine its claim that there's a compelling interest and it's narrowly tailored. And here that's particularly true because they're providing exemptions for religious objectors. But it's just a complete misfit because the religious objectors they're provided to are churches even when they don't have a religious objection and they've done it for these church plans. Both of those things have nothing to do with the ACA. The fact that they provide the exemption doesn't mean the church has to bill itself up the exemption. But it means that they can. And the fact that the government made it possible for them to do that suggests that it was not narrowly tailored to compelling interest. If I could get back to your basic original question, which was Then we need to move on because Mr. Renzi still hasn't even started. We haven't even gotten an understanding yet. If I could just make one point. It is a very fundamental point here. You asked the question of why the government had to do anything given that the accommodation was there. And I think what's important to recognize is that the mandate imposes a substantial burden. There's no dispute about that. The Supreme Court held that in Hobby Lobby. So then the question is how does the government deal with the substantial burden it has imposed? Nothing in RFRA says that we have to pick the accommodation rather than the exemption as the means of solving the substantial burden that we've imposed. The statute says we can't substantially burden religion and we have the discretion to solve that problem by using the exemption, particularly when the validity of the accommodation was subject to There was a circuit split over whether the accommodation was valid. There was just one outlier. The rest agreed. It was fine. There was one circuit court. And the rest of the circuit courts found the accommodation not to be necessary. And at the district court it was much more varied. More importantly, it then went to the Supreme Court, which found the issue sufficiently difficult that they pumped it on it. The Supreme Court couldn't resolve this issue. There were real alternatives where we relied upon the reasoning. Clearly it's dictable. We relied upon the Geneva College reasoning even after Zuber. My point is whether or not the accommodation was valid, the idea that we are somehow required to go with the accommodation rather than the exemption, there's nothing in the text of RFRA that says that. In the case law that says you do need to consider the impact of an accommodation to address the concerns of one group, what the consequences are on the non-beneficiaries of that exemption. I'm sure you're familiar with all this. That's right, Your Honor. And so doesn't the accommodation do just that? It respects the religious objectors without having this consequence on those who are seeking these particular services. So a couple of things, Your Honor. First of all, no in part it doesn't because of the self-insured church plans. The self-insured church plans, the women don't get the coverage. Second, there's nothing that requires us to pick that option rather than the other, especially because this is a case where the government is removing a burden that is imposed on religious objectors. Thank you. Thank you, Your Honor. Just to answer the question that's being asked, it still has to do with our president, Mr. Mupon, and it has to do with the failure to engage in notice and rulemaking. And we do have precedent that says you have to do it that way. And you say you can be excused in this circumstance. No, Your Honor. What I'm saying is that we went through notice and comment. This is a challenge to a final rule. The final rule went through notice and comment. The final rule was preceded by comment, and then we initiated the final rule. Thank you. Thank you. Renzi? Did I get your name correct? Yeah, Mark Renzi. We're little sisters. May I also reserve two minutes for a bottle? Would that be permissible? Well, why don't you just decide this came up a while ago, and we've got two bottles being reserved. Okay. How much time did Mr. Mupon reserve? Why don't you take four minutes and then decide who's going to take your bottle? That's fine. Mr. Mupon can have it. That's fine. Okay. That was easy. May it please the Court. What I'd like to do is admit it. You may not want it now. If he sees it, I will happily take it, Your Honor. May it please the Court. I'd like to address Judge Flinters and Judge Schwartz's procedural questions about the IFR and then move to why the RIFRA analysis, the substance of the RIFRA analysis, actually overwhelms and takes over the procedural analysis. In other words, ultimately, the RIFRA is the answer. Is anyone going to get to standing here, which is kind of the preliminary hurdle we have to jump through? Your Honor, I'd be happy to leave standing to the briefs. Let me make this point about the state's standing argument. As long as you agree, that's fine. So I'm happy to leave it to the briefs. I'll make one argument. It cannot be waived, obviously. That gets to the merits. Can I ask you, before you get to the procedure, I just have a question about the Colorado injunction. Sure. Does the Colorado injunction only apply to the Colorado and Maryland Little Sisters components, or does it apply to the interveners in Pittsburgh, too? It applies to the interveners in Pittsburgh to the extent that they remain on the particular plan that's at issue in the Colorado case. So the wording of the injunction says for the named plaintiffs and all present and future participants in this plan. So there are some participants, some members of the Pittsburgh organization that is not part of that plan. No. This is all about appellate standing. Sure. So currently the Pittsburgh sisters are on the Colorado plan. So if that's the case, then how do you have appellate standing here? Sure. So first, as the prior panel in this case held. I totally understand why they're interveners. I get it. But now they've already gotten whatever benefits they're entitled to get in the Colorado injunction. No, you're right. If I'm wrong, tell me what more relief they could get here. Great. So they could get, in addition to their judicial relief that's tied to one particular plan in the Colorado case and tied to one particular judge, they could get regulatory relief, which, among other things, would allow them to switch plans or go call up Blue Cross and try to get something else. As the prior panel held, they have an interest in preserving the result of the Zubik case, which this is. They have an interest in getting regulatory relief in addition to judicial relief. And they have an issue in getting the correct answer to the RIFR question, which, of course, is going to govern not only how HHS deals with them in this case but in others. That's all in the prior panel. The thing that came out of this, wasn't the Zubik case basically, as Newfound said, the Supreme Court punting to try to get folks to work it out, but it didn't very successfully get worked out, and so we're here. Well, so I disagree. I actually think it was quite successfully worked out. The government eventually acknowledged that it could not defend the accommodation under RIFRA after it had conceded how it actually works. And they did precisely what they were obligated to do. They couldn't defend it? Where did they concede that? They conceded that it was actually the same plan. So they conceded the facts that made it utterly indefensible, which is why they haven't won any of these cases since 2016. We're talking about the accommodation, right? The accommodation. You're saying that the government has conceded the accommodation? The federal government has conceded the accommodation doesn't work, as manifested by what? In these regulations, the HHS acknowledges that the accommodation violates RIFRA. Prior to that. So the current version of, since 2017, they say it violates RIFRA, but before that, thank you. That's what I'm thinking of. Since the executive order, that's your? I think after the executive order, it's in the IFR and in the regulation. They have now taken a position that they agree that they were violating RIFRA. And now the court should say, no, we think it meets the statute, right? Sure. Dozens of courts, though, have said yes, right? So they were doing that not in a vacuum, but with dozens of courts that had already said it violated RIFRA. Not most circuit courts, right? No, but those cases were vacated, and there are dozens of courts. And in Real Alternatives, as Judge McKee was just saying, our circuit has already re-embraced our analysis of accommodation. Two important points about Real Alternatives, Your Honor. First, in Real Alternatives, the court specifically said that they didn't view Geneva College as binding, and they knew they were deciding a different question. Chiefly, Real Alternatives was about employees, not employers. But second and most important, the state wants to rely a lot on Real Alternatives. Here's what Real Alternatives says. Even when noninterference is not strictly required, the government has discretion to grant certain religious accommodations subject to constitutional limitations. That's at page 352 of Real Alternatives. That is irreconcilable, irreconcilable with the view of the ACA and RIFRA that the states are offering you here. This circuit has said, and by the way, Hobby Lobby and Zubik clearly view the world this way, that of course the federal government has discretion to grant exemptions to comply with RIFRA. It would be crazy for Congress to impose this obligation on each and every part of the federal government, every actor, every agency, every department, and say you shall not burden religion, but then fail to give them authority to obey it. It's a prescription. It says you may not do this. You don't need a separate grant of authority after Congress tells you you can't do it. Say, oh, well, where do I look for my authority to not do it? That's not the question, right? And that's why Hobby Lobby, the majority opinion, says that RIFRA, quote, surely allows modification of existing programs. And Zubik, I mean, if the states were right that RIFRA only lets the government fix the problem after they've lost the RIFRA case, then Zubik is nonsense, right? In Zubik, the Supreme Court didn't decide the RIFRA question, right? It expressly said I'm not deciding the RIFRA question, but it sent the parties away for them to come up with a new approach. Obviously the Supreme Court understood what this court and real alternatives understood, which is that, of course, the government is permitted to respect religion. They're obligated to respect religion. That's the point of RIFRA. If I can focus on the RIFRA analysis, and, Judge Schwartz, you mentioned the courts of appeals, that was 2015, and the world is quite different and the facts are quite different after what, and this is not even a switch of administrations from the Obama administration to the Trump administration, after what the Obama administration acknowledged to the Supreme Court in Zubik. If you go back and read your Geneva College opinion, it is all about, and the briefing for that opinion, is all about the idea that if we do the accommodation, it's separate from the employer. You can have your plan, and we're going to do something else. It's separate. I think the Geneva College opinion used the phrase totally disconnected. It's not your plan. Stop worrying about it, sister. Just sign the piece of paper. Well, what eventually came to light at the Supreme Court was that it was your plan, and that is what the federal government told the Supreme Court in Zubik. They said it is actually part of the same plan. That is what they told in an oral argument in Zubik when the Chief Justice said, so you want it to be in one insurance package? And they said, yes, one insurance package. That is what they boasted about in the regulations when they said, look, people won't have to have two separate plans. It's great. It's seamless. That was what they were aiming at was seamless, part of the same thing. Well, once they acknowledged that, it all collapses into Hobby Lobby. Hobby Lobby says it is a substantial burden to make an employer hand somebody a policy that comes with things that violate their religion. Hobby Lobby establishes that none of us have any freedom to vary from it. If you're making the employer hand somebody a plan that comes with stuff that violates their religion, that's a substantial burden. What happened after the concessions in Zubik, and why the federal government could never defend and could never win another RIFRA case about it, is that once they've acknowledged it actually is the same plan under the accommodation 2, then the accommodation is a substantial burden. Then when this court in Geneva College said, oh, you should sign that piece of paper because it's totally disconnected, well, the facts are different. It turns out it's actually the same. That's how they achieved seamlessness. Why does that matter? Well, it matters because since the federal government has an obligation, right, and this is not a discretionary policy choice like whether or not to have a contraceptive mandate. It is an obligation, a statutory and constitutional obligation to respect religious differences. Well, once the agency comes face-to-face with its obligation, of course it's empowered to say, okay, I'm not going to do that anymore. Okay, I'm going to stop burdening the religious objectives. That is, they have the discretion to do that. How do you reconcile that with Congress's decision not to have a conscience amendment, though? Congress didn't think that that was worthy of congressional enactment. So how can an administrative agency do something that seems to be contrary to Congress's will? Because Congress told them to, Your Honor. Congress told them to do something that they themselves don't want to do? No, Your Honor. So two years after the Affordable Care Act, you are correct and the states are correct, Congress didn't pass an additional conscience amendment. Right. But Congress, when it passed RFRA, said this applies to every single future law that we pass unless there's an express carve-out, and there is not. And that's why in Hobby Lobby the Supreme Court found the religious exemption and did not say, oh, well, Congress... Yeah, but the Supreme Court did that, not an administrative agency. And this is a question more about the power of the people in the government. Who's got authority to do what? That's really my question goes to. It doesn't go to anything other than that. If Congress spoke and said no conscience amendment, how could its regulators do something different? It's different when a co-equal branch of government, the Supreme Court says, this is what we must do, and thereafter the regulators implement a mechanism by which it effectuates the Supreme Court directive. That to me is different than what's happened here. So explain this to me. What's the authority of the regulators to do this? The authority is RFRA and the Affordable Care Act. And, again, this is something the Obama and Trump administrations both agree on, which is rare these days. They both agree that under the ACA they have authority to have exemptions. They both agree to that. But the authority is RFRA. Is there a moral part of the exemption also, a religious exemption? The Obama administration did not have a moral exemption. They lost some court cases and won some court cases about it. But I'm speaking about the religious exemption. I don't think the Obama administration said that about moral. But my point is the authority is RFRA. I don't think the fact that Congress chose later on, two years after the Affordable Care Act, to not add an additional conscience amendment tells you that RFRA doesn't apply. Congress told you how to figure out if RFRA doesn't apply, and it's if Congress writes it in a later law, then RFRA doesn't apply. But the baseline law – Isn't the sequence RFRA was predated the ACA, no? Yes, it is. Right? It was RFRA, the ACA, the conscience amendment rejected. Sure. Right? Sure. So a law that didn't get passed is just a law that didn't get passed. They could have not passed it because they said, ah, I don't need it. We have RFRA. But doesn't that – but, again, we're talking about the power of the administrative agency to make what some people have argued to be a pretty – a big change from what the statute contemplated. Sure. So I disagree. I mean – Sure. So one, I disagree. It's not a big change at all. States still can't find a soul who's been impacted by the new rule. So I don't actually think it's a big change. But the point is that RFRA tells the agency – it says government shall not impose a burden. What is the agency supposed to do when they conclude that, wait, I'm violating a federal civil rights statute? And I know your – If I can – My response to you, if we were debating this, and we're not, I'm asking you questions, right? But the response, I guess, would be, well, the accommodation addressed that concern. But your position is that accommodation is insufficient to address the concern. It is insufficient. Do I understand your position correctly? Yes. Okay. It's insufficient. That's my view. But dozens of courts, dozens of courts told the agency the same thing. I agree with you. They weren't all final. Some of them were reversed by later vacated courts of appeals decisions. But the agency wasn't out on a limb thinking, hmm, I'm making up a substantial burden. There were dozens or hundreds of agencies in court. I am not questioning the motivations for why one would do this. And so my point is simply, under RFRA, when they've concluded that they are imposing a substantial burden, they have an obligation because they must follow the statute. They are not allowed to say, my own discretionary policy choice to put contraceptive coverage in the bucket, which is what it was. It's a discretionary policy choice for HRSA to include contraceptives. They could choose the opposite tomorrow. Congress left it entirely to their discretion. When the executive order got issued, it was a discretionary change, correct? It was, as was the contraceptive mandate itself. And my point is RFRA is higher than that. RFRA sits above that. And so they're not allowed to say, well, I prefer my own regulatory policy choice and have a contraceptive mandate over Congress telling me stop imposing those burdens. Judge McKee, you asked about standing. Just a brief point about how the standing analysis, how the standing arguments play into the merits here, because I think it's really important. For the most part, I'm happy to stress on the briefs on standing. But the state's entire standing argument. Well, you testified on this because you said they hadn't produced a single person who had been impacted by this. But you've also argued that no one's being denied because they'll get coverage elsewhere, which they were saying, yeah, they'll get coverage elsewhere. That's going to hit us in the pocket, and that's what they did with the injury. Great. And so my view is simply they have to lose one way or the other, right? So either, A, no employer – Explain how that works, because when I go home, I want to use this with my wife. Right. They have to lose one way or the other. How does that work? I'm happy to discuss it with you here and afterwards. So they have to lose one way or the other. There's only two possibilities. Either, A, no employers are going to take this because all of the religious employers are already grandfathered. They have the church exemption. They all have injunctions. Therefore, it's not going to change anything on the ground for women. If that state of the world is true, then no one's going to come knocking at their door. They're not going to spend a penny. They lose because they have no standing. If, in fact, someone's going to come knocking at the door, right, they have all these great programs that give people contraception, and people will come beating down the door. If that's true, then the rule actually has an impact, and the federal government was obligated under RFRA to let the employers out of it. And, by the way, that's why the government couldn't possibly ever win a RFRA case. Strict scrutiny under RFRA is an affirmative defense, right? The government's actually got to walk into court and assert the affirmative defense to take advantage of it. Well, they eventually decided, quite rightly, that the idea that, I mean, I'm surrounded by governments here, right? New Jersey and Pennsylvania over here, the federal government over here. You're the bigger one behind all this. Well, I've got a more important one behind all that. The idea that all of these governments have a compelling interest, and it's the least restrictive way to get people contraception to say the nuns have to give it out is and has always been preposterous. Of course the governments can get people contraceptives without nuns. That's ridiculous. Before 2012, no one ever would have thought that the way we need to do this is to involve nuns. Pennsylvania's got all sorts of programs. New Jersey has all sorts of programs. The federal government set up health care exchanges, right, where any employee who doesn't like what they're offered by their employer can go and get plans through the federal government, all of which cover contraception, right? The idea that the one and only way we can actually give people who want contraception contraception is to say the nuns have to be involved is ridiculous. And when the states come in and say, I have all these programs, the right answer should be, great, you have all these programs, you love contraception, use your programs, you do it, and let the nuns go home and stay out of it. Last point, Your Honor, if I may, there is no consistent or intellectually honest view of these statutes that can get to the relief that the states are asking for. They say the ACA only allows what but not who distinctions, but yet they ask you to reimpose a system that has plenty of who distinctions, the accommodation, the exception, right? If the ACA doesn't allow it, then the whole thing comes down and they lose under RFRA, right? Judge Schwartz, the only answer to the RFRA claim is maybe the accommodation is good enough. I don't think that's true, but that's their answer. But if they have a world in which the ACA doesn't allow who but not what, or RFRA doesn't allow changes other than for a client-specific and a case-by-case basis, then they can't have the system they're trying to get to. And ultimately, I mean, the real question is what kind of injunction are they asking for? I take them at times in their brief to be asking you to order the government to enforce the old system. But that would have you ordering them to enforce a system that is built on a series of IFRs that came out without notice and comment that has who but not what distinctions and has the agency on its own making RFRA decisions. I don't think you can get there, and therefore we'd ask you to reverse the lower court's decision. Thank you. Thank you. Good afternoon, Your Honors. Michael Fisher for the Commonwealth of Pennsylvania in the state of New Jersey. The district court's injunction here was based on the procedural flaws of the rulemaking and the substance of illegality to the rule itself. Take the first part first. Mr. Lupon says that, and I don't want to misstate him, so he'll let me know when he comes back up if I'm stating anything correctly, that in terms of a regulation going forward, that it has to be that if the initial IFRs are pursuant to invalid notice and comment, but you have notice and comment for the final permit rules, then that has to cure, he used the term, taint. I'm not sure you're saying they're tainted. I think you're saying they're insufficient in and of themselves. Absolutely, yes. The final rules are invalid under the APA. Mr. Lupon asked repeatedly, I think, his question is, what else could we do? The answer is simple. They could withdraw the IFRs. That's all they needed to do, withdraw the IFRs and start a new rulemaking process. But then you're still stuck with the final rule, aren't you? If they withdraw the IFRs? No, if they withdraw the IFRs, issue a notice of proposed rulemaking, and then issue a final rule based on that, the presumption of regularity attaches, and the final rule is presumed to be valid. His point is that they went through that exercise except for review of any IFR, that they had a notice of comment before the final rules were promulgated. So from their point of view, we have accomplished that, which you're now proposing they should do. And that distinction makes all the difference in the world under NRDC and under this Court's precedence. And the reason for that is actually set out in Cher and Steele, which NRDC relies on. If the agency is out there forcing the rule, you have to come hat in hat, I apologize. No, you're saying basically you can't unring the bell. Exactly, you can't unring the bell, and the agency has already made up its mind. And here, actually, that point is especially valid because what happened is the IFRs are issued. They're challenged by several states, including Pennsylvania at the time. They are in court arguing that the IFRs are valid. They are making arguments in court that our claims were wrong, while at the same time they're purporting to consider comments raising those same claims. So on the one hand, they're saying you're completely wrong. On the other hand, they're saying we're open-minded to all of these arguments that are coming in. So the fact that the IFRs – They really believe that they're wrong. They believe that they're wrong. The fact that they believe they're wrong at the final stage doesn't mean that they have to step back and entertain a position which they think is invalid just because procedurally they have to go back now and entertain their comments. Well, the APA requires that they consider comments with an open mind. They are presumed to do so if they follow the procedure. They did not here. They started with a final rule. They started with a rule that went into effect the day it was issued. Before it was even in the Federal Register, they said this rule is in effect. So the fact that they took comments on that rule while it was in effect does not cure that problem. And that's what this court recognized in NRDC and validated both the initial interim final rule and the final rule. And Mr. Lupon's point about, well, that was different because that dealt with suspending earlier amendments, that's simply actually not the case. The court in NRDC could have said, we'll invalidate the earlier rule, the IFR, but we're going to say the final rule is valid and that, therefore, those amendments went into effect on the date they originally went into effect, and then they were suspended. As of the date, they were suspended under the final rule. They could have done that. And, in fact, the NRDC court, at the very end of its opinion, says the agency is free to make changes to these rules to adjust them further if it follows the correct process. What if they walked outside the hall and said to you at the conclusion, you know something? We're going to pull the final regulations. We're going to pull them. And we're going to initiate a brand-new APA process. And we're going to tell you right now the regulations may be exactly the same. But we're going to pull it off and start anew. Would it be your position that even that new regulatory activity would be tainted by what had happened up until now? No, it wouldn't be tainted by that. It would be tainted by that last comment you mentioned, that they say we're not going to make a change at the beginning of the rulemaking process, that I think we could carry our burden of showing that they approached the process. They don't say those words, but when they put out the proposed rulemaking and they say this is what the rule is going to look like, and every single word and every single piece of punctuation is exactly the same, are you saying that that subsequent act has been tainted by the prior, such that they could never do it? No, not in that case. In that case, well, what happened is that the presumption of regularity would attach. And if we wanted to challenge it, we would have to show that they approached the issue with an unalterably closed mind, which is a high burden for plaintiffs to bear in an APA case. If I'm mispronouncing it, I apologize. I'm doing it phonetically, which is not what I heard when you told me how to pronounce your name. But he is saying that there were some substantive changes. Were there substantive changes in the finals as opposed to the interim? There were some changes from the interim final rules to the final rules. They were very minor changes. Well, you can see they're minor, but it doesn't have to be major. If they were substantive insofar as it would suggest that, that subsequent notice and comment provision really did have some significance, it wasn't just a CYA action. Well, the fact that they made only sort of some technical changes that really, frankly, didn't respond to any of the concerns raised by the objectors, including the states. I mean, we, you know, one thing that's been brought up a couple times is that the district court did not grant us an injunction on the basis that the agency adequately responded to comments. We had included that argument in our motion. We received the administrative record three days before the injunction hearing, so we weren't in an ideal position to support it. We have since been able to go through the comments. We have filed for summary judgment. And what those comments show is that the overwhelming majority, 99.9-something percent, opposed the rule, thought it was a bad idea. They made some technical changes that dealt entirely with, dealt primarily with entities that were able to take advantage of the rule, made it a little broader for church plans. They did not change the rules in any way that suggested they were responding to the substantive comments, particularly the ones from medical professionals, from organizations that talked about the importance of seamless access to contraception toward women, talked about states and the impact on state programs. And I would say on this point, both the government and Little Sisters cite a First Circuit case as support for their argument that post-propagation comments cure. I would actually suggest you look at that case because what that case says, Levesque, it's the Levesque v. Block, 723F2-175. I'll just read actually from it. It says, the general rule that frowns upon post-propagation comment periods reflects the concerns that underlie Section 553. Public comment contributes importantly to self-governance and helps ensure that administrative agencies will consider all relevant factors before acting. The service, purposes, notice, and opportunity for comment must come at a time when they can feasibly influence the final rule. Ordinarily, this can only take place before a rule takes effect. And then they go on to say that when pre-promulgation comment is impossible, commenting after the fact is better than none at all. That's not the situation here. Then they say, when pre-promulgation comment is possible, however, one does not want to encourage the circumvention of Section 553 by accepting post-promulgation procedures. So what the first circuit said, and this is the case they rely on, is that if we said you could cure an invalid rule just by accepting post-promulgation comments, then we would be telling the agencies essentially, there's really no reason to follow the APA in the first instance ever because the worst that can happen is the IFR gets adjoined, but your final rule will be valid, and you'll be no worse off. And if the IFR remains, then you're better off anyway. That's the essence of your case. It makes it rather simple if we follow what you're suggesting, that we invalidate the rule because of failure to follow the APA. Yes, absolutely. That's it. To validate both rules. Well, uphold the injunction. The injunction, yes. Nationwide. Let's go with the injunction. Yeah, let's go with the injunction. Well, but I think that's relevant because our final remedy, we're here obviously on an interlocutory basis. The final remedy that we believe is appropriate is to make a term of the final rules, and that's what we've asked for. Is there always a case, I think Mr. Mulcahyne suggested, that you can cure it, subsequent notice and comments? You cannot as long as the rule remains in effect. That's the key distinction here. They do not withdraw. If you validate the rule first, then you can have notice and comments. Well, they would have to say, we are no longer attempting to enforce this rule. They presumably would withdraw their appeal because they couldn't continue to litigate the legality of the rule that they're saying is no longer in effect. I mean, the court could say that the ultimate rule is invalid because of failure to follow the APA. Yes, absolutely. And that's the remedy that we have asked for. That's what you're asking for. If we could talk about the substantive APA challenge. As I understand it, your point of state's position is that the ACA authorizes the types of services to be provided but does not allow the administrative agency to decide who's responsible for providing those services. Is that your argument? Absolutely, yes. So how do we reconcile that with the fact that the agency has done certain things to address the who question in certain circumstances, like the church exemption, like the closely held company exemption post Hobby Lobby, and the accommodation, which you're out to serve. The agency has created both the exemption and the accommodation earlier. Our position is that the ACA, as is written, does not authorize the agencies to promulgate exceptions to the mandate. So to the extent the agencies did, they would have to rely on some other authority other than the ACA, or perhaps what they should have done was gone to Congress and said, we think there's a problem here that needs to be addressed, and sought a legislative solution. There was an effort, as your Honor mentioned earlier, to pass a contractual amendment. It did not succeed. But what's important in this case is that the legality of those earlier rules is not an issue. And is it fair to say that part of the reason why they might be different is because, at least as it relates to the church exemption, and I'm using that as a shorthand, forgive me, but you know what I'm talking about, organizations that have religious purposes, and the closely held company exemption came about to actualize Supreme Court precedent. Is that a fair distinction? Yes. In the context of the church exemption, the real alternatives have a lengthy discussion of the church exemption, and it grounds it squarely in the historical practice of respect for church autonomy and essentially what's referred to as the ministerial exemption. Right, Hosanna Tabar. So that is Supreme Court precedent stemming from First Amendment. Exactly. And we're not, to be clear, we are not taking a position one way or another on how the ministerial exemption applies. It's a difficult question, but it's not an issue in this case. Okay. Then let's just focus on the accommodation. The agency created this method of accommodation. What is there? And it goes back to power. What is the agency's power to do that? If the reading of the ACA is, thou shalt not dictate the who. Provide the services as listed in the preventative care and screening guidelines, but you agency can't dictate who provides them. Well, the agency believed that it was actually complying with what's in the ACA by ensuring that the same who would provide the services. In the case of insurance carriers, they would still be providing contraceptive services, just apart from the underlying plan that the employer wanted to offer without contraceptive services. So you're saying in that case the who is the insurance company, not the employer. Yes. I see. Now, it gets a little more complicated in the ERISA context, which is where you have self-insured plans, and this is where Mr. Reanzi sort of bases his argument that, well, the government reversed the mission or something. None of that is accurate. It's not actually what happened. But they tried to argue that under ERISA, technically speaking, as an ERISA legal matter, the contraceptive services would be provided under the same health plan as the term of art is under ERISA. So the agencies believed, correctly or not, but they believed that they were complying with the language of the ACA. And certainly they were complying with the goal and the purpose of the Women's Health Amendment, which was to get, as has been referred to repeatedly, seamless access to contraception to women. And I'm happy to sort of talk a little bit more about what that means, because I think it was glossed over a little bit in some of the earlier arguments. But just to return to your point real quickly, there are difficult questions we can see about the legality of the earlier rules. We are simply challenging these current rules and arguments. Whatever the status of those earlier rules, these go too far. These are illegal. They violate the ACA. They're not justified under RFRA and they're procedurally invalid. Let's talk about your RFRA argument. Assume for the purpose of this discussion that somehow under RFRA, a regulator can promulgate regulations that sort of embodies compliance with the RFRA statute. Okay. So we'll just assume that there's some authority. Why don't these comply with RFRA? Aren't they a method by which it ensures that there isn't a substantial burden on an objector? Because these go much further than what RFRA would require. Somehow. And let me step back and just say for a minute, even with that assumption, we still have to remember here that we are operating in the context of a congressional mandate, that these services are mandatory. They delegated to HRSA the responsibility to identify which services, which they did for obvious reasons. But Congress said these services are mandatory. So there was some discussion, you know, I think Councilman Beside sort of indicated, well, agencies give it, agencies take it away. This is not the agency imposing this mandate. This is Congress. And that has to frame an entire RFRA analysis. But beyond that, RFRA depends on the finding of a substantial burden. And that's the first step in any RFRA analysis. This court in Geneva College rejected the argument that the accommodation which then existed imposed a substantial burden. Now, Geneva College was vacated along with all of the other cases. It really is dictated. It is. I mean, I would say it isn't, it isn't. I mean, it's very important to. Well, it was vacated. Yes. And it gets into the, it relies upon the reasoning of that case, almost as though a presidential, but it clearly realized there was not binding anymore because of the court's action in Zubik. Well, what, what, what Fred Rendell said in the alternatives was Zubik vacated Geneva. It did nothing to undercut the logic of that decision. And we continue to believe that the logic of that decision was correct. We believe that for instance, the existence of a substantial burden is a matter for courts. It's a question of law. That's clearly part of the holding of real alternatives. We continue to believe that the mere assertion of a substantial burden does not necessarily satisfy the burden of showing that there is one now on a footnote in real alternatives, the court says, and we also continue to believe that the accommodation in Geneva college did not impose a substantial burden that I would agree was not necessary to the holding,  this is what we said in Geneva. We'll say it again. It wrestled with the fact that Zubik had vacated Geneva and simply said, we continue to think the logic was correct. And real alternatives was a presidential opinion. They petitioned Frombach review. I believe only the original, the center voted Frombach. So it certainly has significant persuasive weight. And as, as George mentioned earlier, there were nine circuits that addressed this issue prior to Zubik. Eight of them ruled that the accommodation was not a RIFRA violation. One of them, the eighth ruled the other way, the agencies and their discussion of RIFRA in the final rule rely on that ninth opinion and arguing that there is a substantial burden. They don't even mention in the rule that it was vacated. They don't mention real alternatives at all, except to fight to the defense. Now real alternatives was not vacated by Zubik. Because one of, I believe two decisions after Zubik that sort of addressed issues related to this case, you would think the agencies would look to that as perhaps some sort of guidance. They did not, as I mentioned, they simply cited the dissent and relied on the vacated decision from the eighth circuit. Just to continue with the chronology a little bit, Mr. Yandy said, I think dozens of courts impose injunctions that the engines had to follow all of these are either pre Hobby Lobby and relate or relating to the issue presented in Hobby Lobby or post these new rules. So what happened following new rules, the agencies basically stopped defending these cases. So they're all pretty much, you know, post Zubik unprotected injunctions from district courts. You know, I think, you know, this court is aware that in the absence of adversarial briefing, you know, the decision from a district court probably isn't that persuasive, especially when you're looking at issues like substantial burden, compelling interest, least restrictive means, which are fairly tricky and technical in this case. So all of those injunctions we think are simply not relevant to this case. The courts that have looked at the rule, the district court here, the district court in California, both decided that it was unlawful. Both rules were unlawful. Let me just ask you, and again, assume for the purpose of this question, that we conclude that there's a problem with the, with the regulation. The ninth circuit rejected a nationwide injunction, despite what the district court wanted to do. We have a district court here who decided nationwide injunction was warranted. Why should we do something different from our sister circuit? Should we agree with this analysis on the merits of the case? The reason that the nationwide injunction should be affirmed in this case is because the record is very different and the analysis below is very different. The district court in California originally imposed nationwide injunction, I believe, without a great deal of discussion given to the issue. This is in the first case in the IFR. The ninth circuit vacated a reverse bad aspect of the decision and said, simply, there isn't enough here to support this. Here, the government made the same argument below that they make in their briefs here. They challenged the issuance of a nationwide injunction. The district court went through all the factors that they identified and said, simply, that only a nationwide injunction will afford complete relief to the parties. She did so pursuant to her equitable authority. Courts have consistently recognized that they have, you know, fashion the scope of an injunction and where the district court in particular addressed all of the arguments that were raised, you know, this concern about letting certain issues percolate among the circuits, you know, the question of whether a nationwide injunction would be over abroad. She addressed all of these, considered them, ultimately rejected the concerns. They're free to disagree with those conclusions, but she did not abuse her discretion. And the reason, and part of the reason for this is. It's worth asking the question of what would an injunction that only applied to Pennsylvania, New Jersey look like? How would that sort of segue into my next question? If, if the relief granted is baked, baked to tour is what you're looking for. That means thou shalt not the rule is void and unenforceable. If that's what this court were to hypothetically rule, is it enforceable by anybody else? If we vacated the rule? Well, to be clear in this appeal, this interlocutory appeal, we are only focused on the preliminary injunction. I think we have moved for summary judgment. The district court just last week, I believe, asked for a vacancy. So if that's granted, we'll be back here. So your position is that a preliminary injunction of a nationwide scope is necessary because you're not, you can't get the ultimate relief of vacancy or all we would be doing. If we were to affirm would be there's a reasonable likelihood of success that that would be your ultimate remedy. Yes. And if therefore to preserve the status quo and, and in this courts, they could turn is the default remedy for an invalid rule. There was a decision. Mr. Renzi's. He didn't pay it this way. The heads. I wouldn't tell us you lose argument insofar as the injunction is concerned. So lose, lose proposition for you. Well, I think that was on standing as I understand it. And actually, I mean, this is an important point that I want to understand. It was tied into the scope of the, well, I think, I think the argument he was making was that, you know, we've argued that we all have, we have government programs that will be required to fill in the gap. In some cases where women are denied coverage. And therefore, if that happens, there will be no harm for, for the rule. One does not follow from the other. We have programs, but if you look at the evidence in the record and the amicus briefs, they are not an adequate substance substitute for what the ACA required. The, the congressional debate on this is very clear. The goal was to eliminate the preventive services gap that women suffered. Senator Mikulski said, what we want to do is ensure that decisions about preventive services are between a woman and her doctor. So by requiring plans and insurers to provide these services, we're seeing to it that women can go to their primary care doctor and get advice about contraception. They can get a prescription. What they're saying is, well, adequate. If a woman gets insurance for everything, but contraception from her employer. So she goes to her doctor. She can talk about everything, but she can't get a prescription for contraception. She has to go to a title 10 clinic for that, or she has to enroll in a separate state program. That may be, you know, that alleviates some of the problem, but it does not achieve the goals of the women's health amendment and what Congress was really trying to do within impose these obligations without cost sharing requirements. And that last part is important. Congress wanted to see to it that women actually did use these services when they needed them. So it prevented insurance companies from charging anything. Clearly Congress's goal is not simply seeing to it that women had access broadly defined, but that they could get these services from their primary care physicians. And in a way that would not increase the burdens on them to say, well, you know, these other options are substitute simply ignores what was going on here. Four quick points. If I may one on the procedural issue, he recognized that we can't be permanently disabled from having this role. So his only suggestion was what we had to do was first withdraw the IFR before we went through the notice of common rulemaking, nothing in the APA says we have to do that. And it would be completely form over substance, particularly in this case where the IFR was already enjoined. So his position is that our, somehow our notice and common rulemaking was no good because we didn't withdraw and then joined the IFR. That makes no sense. Nothing in the APA supports that. Second on the substantive authority question, he basically admitted that both the church exemption and the accommodation itself would violate the ACA on his position. We, this is a Chevron case, unless the statute unambiguously forecloses it, the agency has authority to interpret the preventative services mandate the way they did. And under his position, the Supreme court in Hobby Lobby relied on the accommodation. And that was actually ultra-virus because the accommodation was illegal under the ACA. That's just not a reasonable interpretation of the statute and shows why we should win under the ACA alone. Under RFRA, the third point his position is essentially boils down to the government has to thread the needle exactly perfectly. If we get it a little bit wrong on one side, we violate RFRA. If we get it a little bit wrong on the other side, we violate the ACA. If we don't get it perfectly down the middle, we're going to be in violation of one or the other. And what the Supreme court made clear in Ritchie is that just not how you should interpret statutes. The government should be given latitude where we know that we've got a problem under RFRA because there's a substantial burden from the mandate. We should be given latitude to eliminate that substantial burden without being forced into what is essentially impermeable litigation. So your view is that women's health care is on different footing than religious freedom? That's not the position, Your Honor. What the position is is that RFRA says that we can't impose a substantial burden on religious exercise. The mandate clearly imposes a substantial burden on religious exercise. Hobby Lobby told us that was true. We have discretion in how we eliminate that burden. And to be clear, as I mentioned earlier, even the accommodation led to some women not receiving care. The ones who were in self-insured church plans. So they simply cannot say that the accommodation managed to solve both problems because there were women under the accommodation who didn't receive health care contraception services. My last point is the nationwide injunction point. I think it's very important that as Your Honor recognized in the ninth circuit, not only is the ninth circuit said, nationwide injunctions are inappropriate. That case involves 14 states. If we win that appeal, it will be utterly meaningless if this court affirms the nationwide injunction on behalf of these two states. Fourteen states could sue us all loose and they will still make. You already won that appeal. You won on the injunction anyway, right? It's only a 14-state injunction. You already won on the nationwide part, right? Yes, and that's my point. Those 14 states are now, they have the same claim on merits as the plaintiffs here. We could win that appeal. It's being argued in two weeks. Right. We could win. The ninth circuit could say these rules are totally valid. Those 14 states are entitled to no relief and they would still all get complete relief courtesy of this injunction, and that is a gross abuse of discretion. Even if you hypothesize there might be some cross-border harms of the type that they're saying, the idea that those small cross-border harms are enough to justify imposing a nationwide injunction with respect to religious employers throughout the connection to Pennsylvania and New Jersey who have no effect on Pennsylvania and New Jersey. That is a minimum of gross abuse of discretion. You make a very good point, but what is the remedy for us to say that a U.S. District Court judge has no power, no authority to issue a nationwide injunction? Well, so I would say two things, Your Honor. First, the basic bedrock principle is that as a matter of both Article III and equity, injunctions should go no broader than necessary to address the plaintiff's own injuries. This court itself has recognized that in cases like Ameron and CUNA. So you've already basically held that you can't issue a nationwide injunction unless it's necessary to redress the plaintiff's injuries. Now here, to be fair, they have said that it is necessary to redress their injuries because they've hypothesized that there are some small number of people who don't live in Pennsylvania and New Jersey, and therefore there's some amount of cross-border harm. So it's okay in this case? No, we don't think it's okay. That's how they're trying to justify it. What I would say is two things about that. One is that it adds yet another layer of speculation over the already significant speculation in their theory of harm. They need to say that not only is there an employer who would invoke this, who would then have women who would lose coverage, who would then go and get state funding, that all has to happen with respect to a cross-border employer or a cross-border student. That's a whole lot of speculation. They don't actually have any concrete evidence that anyone like that exists. But even if you grant them that there may be some people like that, so that maybe there's some amount of harm that this injunction is picking up, the injunction is also wiping out these rules nationwide for countless employers who don't pose that harm, and that there's a minimum of abuse of discretion to impose such a grossly excessive relief. That would mean that just because these two plaintiffs have shown injury to themselves by hypothesis, you could wipe out the injunction for everyone such that, for example, if we win in the Ninth Circuit, that win is completely and utterly meaningless. Are you addressing that the power of a district court judge to issue a nationwide injunction, or are you saying that in this case it should not be done? So it's twofold. Our point is that as a matter of power, you can never issue an injunction that's broader than necessary to address the plaintiff's own injuries. But that doesn't really answer the question. And then so then the second point is, here we think that as a matter of power, because their cross-border harms are too speculative, the court didn't even have power to do it. But if you disagree with us and you think that their cross-border harms are not too speculative, then we agree that the court, as a matter of Article III power, could consider granting a nationwide injunction, but we think it would be a gross abuse of discretion based on just those minimal cross-border harms to impose a nationwide injunction with respect to the plaintiff's own injuries.  the fact that they have no right to do it, doesn't have any effect whatsoever on Pennsylvania. There's no constitutional prohibition. You're saying that it depends on the case? There's a part of it that is of constitutional significance. They have to identify some harm to them. We don't think that they have, but if you disagree with us about that, then there's no further constitutional issue. But we do think there is one if they haven't identified harm to themselves. I'd like for you to transcribe from this case. I neglected to get one in the Widener versus Northern Berts. You can contact counsel and have one. It may not be necessary. If not necessary, let us know. As to the last argument in terms of the scope of the nationwide injunction having an impact on the Ninth Circuit case, if the government wins that appeal, that would be helpful if you could respond to that in a 28-J letter. Unless you don't think it's necessary, and you think it's covered in the briefs, then just send a note letting us know that. But that would be helpful. Thank you.